UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHAD NOBLE, | ) | |
|       Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 2:14-cv-00376-JMS-DKL |
| | ) | |
| UNITED STATES OF AMERICA. | ) | |

**Entry Denying Second Amended Motion for Relief Pursuant to 28 U.S.C. § 2255
and Denying Certificate of Appealability**

For the reasons explained in this Entry, the second amended motion of Chad Noble ("Mr. Noble") for relief pursuant to 28 U.S.C. § 2255 must be **denied** and the action dismissed with prejudice. In addition, the Court finds that a certificate of appealability should not issue.

### I. The § 2255 Motion

*Background*

On July 19, 2011, Mr. Noble was named in a nine count multi-defendant Superseding Indictment filed in the Southern District of Indiana in Cause No. 2:11-cr-0009-JMS-CMM-5. Mr. Noble and others were charged in Count 1 with conspiracy to possess with intent to distribute and to distribute 50 grams or more of methamphetamine (actual) and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Non-Narcotic Controlled Substance, in violation of Title 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

On July 18, 2012, the Government filed an Amended Information pursuant to 21 U.S.C. § 851(A)(1) alleging that Mr. Noble had been convicted of four prior felony drug convictions.

On October 25, 2012, following a four-day trial, the jury found Mr. Noble guilty of Count One of the Superseding Indictment. On February 5, 2013, the Court sentenced Mr. Noble to a term

of life imprisonment. Mr. Noble was also ordered to serve ten years' supervised release, and to pay a fine of $1,000 and a special assessment of $100. Judgment was entered on the Court's docket on February 11, 2013.

On February 18, 2013, Mr. Noble filed a direct appeal of his conviction and sentence. In his appeal, Mr. Noble argued that the Government's evidence only proved a buyer-seller relationship and thus was insufficient to convict him of conspiracy to distribute methamphetamine. *See United States v. Noble*, 536 Fed. Appx. 654 (7th Cir. Sept. 18, 2013) (unpublished order). The Seventh Circuit affirmed the district court, finding that the government did present sufficient evidence to support a conspiracy conviction. *Id.* Mr. Noble sought further review from the United States Supreme Court, but his petition for certiorari was denied on December 9, 2013. *Noble v. United States*, 134 S. Ct. 807 (2013).

On December 8, 2014, Mr. Noble filed two motions pursuant to 28 U.S.C. § 2255. One was filed *pro se* resulting in the opening of Case No. 2:14-cv-382-JMS-WGH. The other was filed by counsel, Kathleen Sweeney, resulting in the opening of Case No. 2:14-cv-376-JMS-WGH. The *pro se* action of No. 2:14-cv-382-JMS-WGH was dismissed as duplicative and this action proceeded. After attorney Sweeney filed a first amended motion to vacate under 28 U.S.C. § 2255, her motion to withdraw was granted and on April 3, 2015, new counsel, Jeffrey Brandt, filed a second amended motion under 28 U.S.C. § 2255. That motion is now fully briefed.

*Discussion*

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). Mr. Noble's claims of ineffective trial counsel are: 1) trial counsel failed to investigate and interview witnesses that, if called to trial, would have led to acquittal; 2) trial counsel failed to

move for mistrial when it became clear that no evidence tied the only physical drug evidence introduced at trial to co-defendant Greg Miller and the charged conspiracy; and 3) appellate counsel inadequately presented the insufficiency argument on appeal, including making a false statement that Mr. Noble was the "middleman" for co-defendant Greg Miller." Dkt. 16.

The United States argues that all of Mr. Noble's § 2255 claims lack merit.

*Ineffective Assistance of Counsel Claims*

The right to effective assistance of counsel is violated when the performance of counsel falls below an objective standard of reasonable professional conduct and prejudices the defense. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). For Mr. Noble to establish that his "counsel's assistance was so defective as to require reversal" of his conviction, he must make two showings: (1) deficient performance that (2) prejudiced his defense. *Strickland,* 466 U.S. at 687. "To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, our review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014) (internal quotation omitted).

To establish prejudice, a petitioner must "show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable." *Id.* (internal quotation omitted). If a petitioner cannot establish one of the *Strickland* prongs, the Court need not consider the other. *Id.*

Mr. Noble's first claim is that his attorney failed to investigate and present testimony from witnesses who would have testified that Mr. Miller had admitted that Mr. Noble was not part of the conspiracy. Mr. Noble states in his affidavit that he told trial counsel that he "was not in a

conspiracy with Miller and my dealings with him had to do with real estate." Dkt. 24-1, ¶ 5. He denies having had any drug dealings with Mr. Miller. *Id.* at ¶ 9.

>As recited by the Seventh Circuit on direct appeal,

> Miller typically used his cell phones—which investigators were monitoring—to order methamphetamine from Noble. At trial the government played recordings of those calls. In one, Noble and Miller planned future methamphetamine deals that would get Miller out of a financial slump. Another time, Noble applauded Miller for "doing right" to elude police detection by changing phones frequently. And on one occasion Noble admonished Miller—addressing him by the familial term "cuz"—to "clean the house out" after one of Miller's distributors was arrested with methamphetamine Miller had supplied. Noble also offered to investigate and report to Miller the status of the jailed distributor.

*Noble,* 536 Fed.Appx. at 655.

> Testimony about the Effingham seizure consumed much of the trial, but Miller never asserted that those drugs were destined for him (in fact, Miller had thought Noble was in St. Louis buying marijuana, not in Dallas getting methamphetamine). All that Miller said about Effingham is that he loaned the defendant $9,000 to post bond with the expectation that Noble would "get back out on the streets" and sell to his other customers to repay the debt. (A second codefendant, also testifying as part of a plea agreement, opined that Miller's apparent generosity had been a ploy to discourage Noble from turning informant.)

> Miller continued communicating by phone with the defendant during his incarceration. And five or six times he sent Noble money for his commissary account because, as Miller put it, they "did business together" and "had a pretty good business relationship." After Noble's release from state prison, he and Miller discussed resuming their previous dealings, but the two men were arrested on the federal indictment before those plans were executed.

> These facts are all that link Noble to the alleged conspiracy. The other eleven codefendants dealt only with Miller, and, as far as the evidence shows, Noble knew only two of them. Thus, the government's case against Noble turns entirely on his dealings with Miller. Noble introduced no evidence.

*Id.* at 655-56.

On appeal, the Seventh Circuit considered Mr. Noble's claim that he was not part of a conspiracy. "[I]f the government proves these three characteristics of a drug sale--repeated transactions, credit sales, large quantities of drugs-- a jury is entitled to infer the existence of a

conspiracy." *United States v. Noble,* 536 Fed.Appx. 654, 657 (7th Cir. Sept. 18, 2013). At trial, the government presented evidence that Mr. Noble had, about a dozen times, sold to Miller on credit large quantities of methamphetamine. *Id.* "So, although that is the only evidence the government presented that links Noble to the Indiana conspiracy, it is enough to support his conviction." *Id.*

To establish prejudice for failure to conduct an adequate investigation, a petitioner must demonstrate what information would have been discovered through the investigation and that the information would have produced a different result. *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987). If "potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial*." Id.* To establish ineffective assistance for failure to investigate a defense, "the defendant must make a comprehensive showing of what the investigation would have produced." *Granada v. United States,* 51 F.3d 82, 85 (7th Cir. 1995) (internal quotation omitted).

Mr. Noble has tendered a letter dated September 17, 2012, which he gave to his trial attorney asking him to interview individuals and call them to testify at trial. Dkt. 16-1. He provided names and phone numbers for five people and two other names but no contact information. Mr. Noble gave his attorney a letter signed by Marion J. Pruitt, not dated or sworn under penalty of perjury. Dkt. 16-2. Mr. Pruitt writes that while he was in Vigo County Jail with Mr. Miller in May and June, he talked to Mr. Miller about the federal case. Mr. Pruitt states that Mr. Miller told him that "him and Chad [Noble] never done any meth related business and he don't know why Chad is involed (sic) in any of this." This particular testimony, however, *if* ever given, would have been easily contradicted by the government's evidence of Mr. Noble having sold to Mr. Miller large

quantities of methamphetamine on a dozen occasions. There is no reason to believe that calling this witness to testify would have changed the outcome of the trial.

A second letter was signed by Terence Greenwood, one of the individuals Mr. Noble asked his attorney to interview but for whom he provided no contact information. Mr. Greenwood's undated and unsworn letter states that while he was in Vigo County Jail, he talked with Mr. Miller several times and Mr. Miller told Mr. Greenwood that he "didn't know why Chad Noble was involved in the conspiracy drug charges cause he had nothing to do with any of it." Dkt. 16-3. If such testimony had been given, it again would have been flatly contradicted by the recorded conversations between Mr. Miller and Mr. Noble. Even if he had been called to testify, Mr. Greenwood's statements are not specific enough nor persuasive enough to have swayed a reasonable juror to disbelieve the evidence based on which the jury was entitled to infer participation in the conspiracy.

In the face of the recorded telephone conversations between Mr. Noble and Mr. Miller, Mr. Noble's contention that all of his dealings with Mr. Miller were related to the purchase of rental properties was properly rejected by trial counsel. Mr. Noble has not presented specific facts showing that counsel failed to conduct an adequate investigation and even if he had, he has not shown that had counsel interviewed the prospective witnesses, the outcome would have been different. Absent prejudice, this claim of ineffective assistance fails.

Mr. Noble's second claim is that trial counsel was ineffective when he did not move for a mistrial at the end of trial. Mr. Noble argues that the government failed to present evidence connecting the methamphetamine seized from Mr. Noble near Effingham, Illinois to the charged conspiracy with Mr. Miller.

"The decision to declare a mistrial is left to the sound discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Renico v. Lett,* 559 U.S. 766, 774 (2010) (internal quotation omitted). "[A] mistrial is appropriate when there is a high degree of necessity." *Id.* (internal quotation omitted).

In support of the conspiracy, the government presented evidence showing that Mr. Noble fronted Mr. Miller large amounts of methamphetamine and sold Mr. Miller drugs about a dozen times during the spring and summer of 2010. As noted, the Seventh Circuit explained that "[t]he government presented to the jury evidence that Noble had, about a dozen times, sold to Miller on credit large quantities of methamphetamine." *Noble,* 536 Fed.Appx. at 657.

At trial, Mr. Miller testified as follows:

GREGOR MILLER– DIRECT/ONDERAK

Q At one point did you learn Chad Noble got arrested in Effingham, Illinois?

A Same day.

Q Same day he got arrested?

A Yes.

Q Who told you he got arrested?

A Girlfriend of his.

Q What is that girlfriend's name?

A Jamie.

 \*\*\*

She just called you and told you he got arrested?

A Yes.

Q Any other reason she called you?

A  She needed bail money.

Q  You said bail money. What is bail money?

A  The money he needs to get himself out of jail.

Q  I am going to get into that in just one second, but I want to ask you about -- you, you realize he was arrested in late August 2010?

A  Yes.

Q  Did you meet with him a couple of days approximately before he was arrested?

A  Yes.

Q  Tell the jurors what happens at that meeting with Chad Noble a couple days before he is arrested.

A  I gave him $5,000 because he was going out of town I believe to Saint Louis, and I gave him $5,000 to obtain marijuana.

Q  Was he also supplying you with marijuana?

A  Small amounts.

Q  Then why all of a sudden would you give him that money for marijuana?

A  Because I was going to make a profit back on the money that I loaned him.

Q  Is $5,000 a lot of money?

A  Yeah.

Q  Would you loan just anybody $5,000?

A  No.

Q  Why loan Chad Noble $5,000?

A  Because I knew he was good for his word.

Q  And a couple days -- did you see him after loaning him 5,000?

A No.

Q This is cash, correct?

A Yes.

Q A couple days after that, did you have a telephone conversation with Chad Noble?

A Yes. He called me after he had been pulled over.

Q And he called you and what -- you had phone conversation with him, correct?

A Yes.

Q You remember who called who?

A No.

Q You conducted a -- he contacted you on the phone, correct?

A Yes.

Q Tell the jurors about that conversation.

A He had been pulled over coming, I believe, back from out of Saint Louis in a rental car, and the police had searched him. But he told me they hadn't found any drugs or anything.

Q How long after that conversation where Chad Noble told you that the police searched him and they didn't find any drugs did you have that conversation with Jamie where she told you he was arrested?

A I can't tell you exactly. I wouldn't say it was the same day, though.

Q If Mr. Noble came back with methamphetamine, would you ever receive some of it?

A Yes.

MR. RIGGINS: Objection, calls for speculation.

THE COURT: Response?

MR. ONDERAK: He is saying what the agreement was on the $5,000, Your Honor.

THE COURT: If that was the question, I didn't understand it to be that. I will strike the answer. You can sustain the objection. You can reask the question.

BY MR. ONDERAK:

Q Mr. Noble owed you $5,000, correct?

A Yes.

Q You gave him that money to obtain some controlled substances, correct?

A Yes.

Q At the time, were you obtaining methamphetamine from him?

A Yes.

Q This time you gave him the money thinking he was going to come back with marijuana?

A Yes.

Q Did you still want return on your $5,000 investment?

A Yes.

Q How long -- strike that. At the time Chad Noble was arrested, was he still supplying you with methamphetamine?

A Yes.

Q Did you provide money to Jamie to post Chad Noble's bond?

A Yes, I did.

Q How much money?

A $9,000.

Q So you're already out $5,000, correct?

A Yes.

Q Then you paid another $9,000?

A Yes.

Q Why pay $9,000 for Chad Noble's bond money?

A Because I wanted him to get back out on the streets so I could get my money back.

Q Explain that. What do you mean "so you can get your money back"?

A I mean, if he is in jail, I am definitely not going to get the 5,000 I initially loaned him back. At the time I felt it would be worth it to put the $9,000 up to get the 5,000 back, including the money I posted for his bond.

Q And how were you going to get the money back, though?

A Through meth.

Q To your knowledge, did Mr. Noble have a job?

A No.

Q You say through meth you were going to get the money back. Explain that, there being what?

A He would have hopefully got more meth, and I would have been able to get my money back out of him that way.

Q When you posted that $9,000 bond, did you go to the Effingham Jail and post that money?

A No.

Q Why not?

A I didn't want to be seen having anything to do with it.

Q Explain that a little bit for the jurors. What you mean by that?

A I didn't want to go up there and post the bond myself and the cops, everybody seen my face or my name be involved with posting the money for it, the bond.

Q Well, how did you post the $9,000 then?

A I gave it to his girl, the Jamie girl.

Q Is this cash?

A Yes.

Q Is this money from drug dealing?

A Yes.

Q Now, were you aware that he did post bond in Effingham?

A Yes.

Q Were you aware that after that he was in jail on a completely unrelevant [sic], different matter, correct?

A Yes.

Q So from August 2010, when did you see him out of jail approximately?

A Couple weeks into April of 2011.

Q Sometime around there at least, correct?

A Yeah.

Q So from August 2010 until around that time in 2011, around April approximately, he was in jail, correct?

A Yes.

Q While he was in jail, did you have any contact with Chad Noble?

A Yes.

Q How did you have contact with him?

A Through telephone conversations.

Q Through -- was he using a jail telephone?

A No.

Q What telephone?

A Cell.

Q He was using a cell phone and calling you from jail?

[Mr. Miller testified that he gave Mr. Noble money for commissary five or six times ($50 to $100 each time) while he was in jail, and discussed why he sometimes gave people he had dealt drugs with money for commissary while they were in jail, but he did not do so for Sam Moran.]

Q Why Chad Noble and not Sam Moran?

A Me and Chad had a little more closer relationship. We made money through each other and had a pretty good business relationship. I know if I was in his shoes, he would have done the same for me.

Trial Transcript, Dkt. 669, pp. 182 -191.

This evidence was sufficient to support an inference that Mr. Noble's trip out of town was related to his relationship with Mr. Miller. Mr. Miller's testimony supported a reasonable inference that the two men had an ongoing agreement to distribute drugs. These were not urgent and obvious circumstances under which a motion for mistrial would have been viewed favorably. Trial counsel was not ineffective for not seeking a mistrial.

Trial counsel moved to suppress the search of the black duffel bag in Illinois on August 25, 2010, and all of the evidence derived from that search. Dkt. 545. That motion was denied. Dkt. 575. Counsel also moved to set aside the verdict and for new trial based on the alleged lack of evidence of a conspiracy. Dkt. 602. Counsel argued that the evidence, including the pound of methamphetamine seized in Illinois on August 25, 2010, Mr. Miller's testimony, and the telephone conversations between Mr. Miller and Mr. Noble, did not support an agreement to distribute drugs.

This motion was also denied. Dkt. 640. Trial counsel made attempts to challenge the evidence relating to the Illinois traffic stop, but the Court determined that the evidence of record, even if prejudicial, was not unfairly prejudicial, and it supported the inference that Mr. Noble had an agreement with Mr. Miller to distribute drugs. *See* Rule 403 of the *Federal Rules of Evidence.*

Mr. Noble's final claim is that appellate counsel was ineffective when he presented the insufficiency argument but asserted that Mr. Noble was a "middleman" for Mr. Miller. With respect to his claim that counsel was ineffective on appeal, generally speaking, petitioners must demonstrate that counsel "ignored significant and obvious issues." *Blake v. United States,* 723 F.3d 870, 888 (7th Cir. 2013). Mr. Noble concedes that appellate counsel brought the best issue on appeal, but argues that counsel did so in a way that led the Seventh Circuit to deny the appeal. Memorandum, dkt. 17, p. 14.

While the Seventh Circuit did find that the "middleman" label was "baloney," it nonetheless considered whether there was sufficient evidence of conspiracy, and concluded that there was. The evidence of "repeated transactions, credit sales, [and] large quantities of drugs" was sufficient to allow the jury to find the existence of a conspiracy. *Noble,* 536 Fed.Appx. at 657. The best argument on appeal was considered and rejected. The claim of ineffective appellate counsel fails.

*Denial of Hearing*

Mr. Noble did not request an evidentiary hearing. Moreover, the Court acknowledges that an evidentiary hearing is "not required when the files and records of the case conclusively show that the prisoner is entitled to no relief." *Lafuente v. United States,* 617 F.3d 944, 946 (7th Cir. 2010) (internal quotation omitted); *see also* 28 U.S.C. § 2255(b). That is the case here. A hearing is not warranted under these circumstances.

*Conclusion*

The foregoing shows that Mr. Noble is not entitled to relief pursuant to 28 U.S.C. § 2255. The second amended motion for relief pursuant to § 2255 is therefore **denied**. Judgment consistent with this Entry shall now issue.

### II. Certificate of Appealability

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the *Rules Governing ' 2255 Proceedings*, and 28 U.S.C. ' 2253(c), the Court finds that Mr. Noble has failed to show that reasonable jurists would find it "debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **denies** a certificate of appealability.

**This Entry shall also be entered on the docket in the underlying criminal action, No. 2:11-cr-0009-JMS-CMM-5.**

**IT IS SO ORDERED.**

Date: March 15, 2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Electronically registered counsel

**NOTE TO CLERK:  PROCESSING THIS DOCUMENT REQUIRES ACTIONS IN ADDITION TO DOCKETING AND DISTRIBUTION.**